IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ANNE GEORGE,

   Plaintiff,

v.            No. CIV 09-851 LFG/RHS

UNITED STATES OF AMERICA,
et al.,

   Defendants.

**MEMORANDUM OPINION AND ORDER**

THIS MATTER is before the Court on the parties' motions for summary judgment.  On November 30, 2010, Plaintiff Anne George ("George") filed a Motion for Partial Summary Judgment, that is fully briefed. [Doc. 42, 54.] On the same day, Defendants filed a Motion for Summary Judgment that is also fully briefed. [Doc. 43, 55.] After careful consideration of the pertinent law, briefing, and exhibits, the Court grants Defendant's Motion for Summary Judgment, for the reasons described below.

**Procedural and Factual Summary**

On September 2, 2009, George filed a Complaint for Declaratory and Injunctive Relief [Doc. 1] against Defendant United States, Thomas Vilsack, Secretary of Agriculture, and a number of other federal agency officials ("Defendants," "Defendant," or "Secretary").  George's lawsuit is brought under the Quiet Title Act ("QTA"), 28 U.S.C. § 2409a and disputes the scope of the United States' title to an easement across real property she owns in Grant County, Mexico. [Doc. 1, p. 2.;

1

Doc. 24, p. 1.] The easement at issue is referred to as Forest Development Road ("FDR") 6819, 819, or the Shrine Mine Road which traverses George's property.

The pertinent history begins in 1899, when President William McKinley created the Gila River Forest Reserve, which later became the Gila National Forest.  The portion of FDR 6819 that is in dispute in this case is within the external boundaries of the Gila National Forest.  FDR 6819 is a road within the National Forest road system that provides public access to forest lands and that is maintained and managed by the United States Forest Service.

In 1979, so as to settle boundary disputes and facilitate management of forest lands, the Secretary conveyed 1,082.06 acres of land adjacent to the Gila National Forest to John S. Hamilton ("Hamilton").  In its conveyance to Hamilton, the United States reserved two easements.  The easement at issue in this case states:

> An easement for a right-of-way, 66 feet in width, 33 feet each side of centerline for the existing Shrine Mind Road (aka FDR 6819) across portions of the SW 1/4 SE 1/4, Sec.35, T. 18 S., R. 16W., and portions of Lots 1, 2 and SE 1/4 NE 1/4, Sec. 2, T. 19 S., R. 16 W.

Thus, the Secretary specifically reserved a right-of-way over the Shrine Mind Road, otherwise known as FDR 6819 – a then existing public forest development road which crossed the property deeded to Hamilton.

When the government reserved this easement, the Shrine Mine Road had been in use for ingress and egress to National Forest system lands by the public and Forest Service for many years, and was unencumbered by any gates across the road.  The property conveyed to Mr. Hamilton was later platted (in about July 1981) and subdivided into what is now known as the Oak Grove North Subdivision.  Shrine Mine Road traverses eight lots within the Oak Grove North Subdivision,

including Lot 1 (the real property at issue in this case), and provides access to National Forest system lands south of the subdivision.

In 1997, the Carricos, George's predecessors in interest, acquired Lot 1 of the Grove Oak Subdivision through an Escrow Sales Agreement executed in 1990 with Western Bank. In March 2005, Mr. Carrico sold Lot 1 to George. The warranty deed describes Lot 1 and further states "subject to reservations, restrictions and easements of record."[1]

George sought to maintain a closed, although unlocked gate, across FDR 6819 to contain her horse when it was feeding in George's pasture. She contends, in part, that she has the right to maintain unlocked ranch gates[2] crossing portions of FDR 6819. George seeks declaratory and injunctive relief regarding the parties' rights and responsibilities regarding FDR 6819, including a declaration of her right to maintain unlocked ranch gates crossing portions of the FDR 6819 easement, and an injunction ordering Defendants to repair erosion damage and unsafe conditions caused to her property by Defendants' mismanagement of the FDR 6819 easement. [Doc. 24, pp.

---

[1]For the most part, this summary of facts is undisputed by the parties. [Doc. 43, 47.] However, George attempts to challenge a few of the facts recited by the Court based on her argument that Russell Ward's declaration [Doc. 44, Ex. 2], upon which Defendants rely, is insufficient because Ward testified that he had no personal knowledge of certain facts. The Court examined the pages of Ward's deposition, to which George cites, but finds that the cited pages do not directly contradict the facts asserted by Defendant. Moreover, Ward's declaration asserts, in part, that he has personal knowledge of these facts "based on my review of the relevant records, and site visits to portions of Shrine Mine Road (aka FDR 6819) . . . ." [Doc. 44, Ex. 2, ¶ 1.] He further averred that "[a]s current District Ranger, I am familiar with the history of the Shrine Mine road (FDR 6819) . . . ." [Doc. 44, Ex. 2, ¶ 4.] The Court concludes that the facts challenged by George on grounds of Ward's lack of personal knowledge are undisputed, particularly in view of George's failure to contradict, with record evidence, the substance of the proposed undisputed facts.

[2]The phrase "unlocked gate" means that the gate is closed by wire and that a driver seeking to drive along the road would have to stop at the closed gate, exit the vehicle and unlock the gate, enter the vehicle and drive forward, stop and exit the vehicle to close the date, and re-enter the vehicle before proceeding.

2-3.] George also seeks an award of costs and fees in accordance with the Equal Access to Justice Act, 28 U.S.C. § 2412. [Doc. 1, p. 12.]

Defendants assert that as the owner of the dominant estate – an easement over FDR 6819 – the Forest Service has the authority to regulate and maintain the road in accordance with Forest Service regulations pertaining to National Forest system roads.  They further contend that George's gate violates Forest Service regulations which prohibit blocking, restricting, or otherwise interfering with the use of a road, trail, or gate, and which also preclude placing or maintaining any kind of fence, enclosure, or "other improvement" on National Forest system lands without a special use authorization.  The Forest Service has cited George for her use of a closed gate across FDR 6819. George continues to maintain gates on the road, albeit open, pending resolution of this case.

On November 13, 2009, Defendant United States filed its Answer and Counterclaims. [Doc. 18.]  On December 7, 2009, George filed an Answer to the United States' counterclaims. [Doc. 21.]

In the Motion for Summary Judgment, the Secretary argues that the Court need not address the merits of the claims or counterclaims, because George's lawsuit is time-barred as she filed the complaint after the expiration of the applicable twelve-year statute of limitations.  28 U.S.C. § 2409a(g).  The government indicates that should its Motion for Summary Judgment be granted, it will dismiss its counterclaims.

George asserts that the lawsuit is timely as it was filed within twelve years of June 1, 2006, the date which George or her predecessors in interest knew or should have known of the scope of the interest and rights claimed by Defendants.  On June 1, 2006, the Forest Service cited George for violating CFR regulations concerning the blocking or interfering with FDR 6819. [Doc. 44, Attachment 9.]  George's motion for partial summary judgment seeks entry of summary judgment as to Defendants' first and second counterclaims. [Doc. 42, p. 9.] However, there is no need to

4

decide that motion based on the Court's conclusion that the lawsuit is time-barred and the government's agreement to dismiss the counterclaims.

## **Summary Judgment Standard**

Summary judgment is not a "disfavored procedural shortcut."  Rather, it is an important procedure designed to "secure the just, speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).   Summary judgment is appropriate when the moving party can demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 90 S. Ct. 1598 (1970); Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co., 52 F.3d 1522, 1527 (10th Cir. 1995).  The party moving for summary judgment has the initial burden of establishing, through admissible evidence in the form of depositions, answers to interrogatories, admissions, affidavits or documentary evidence, that there is an absence of evidence to support the opposing party's case and the moving party is entitled to judgment as a matter of law. Celotex Corp., 477 U.S. at 325.

The factual record along with any reasonable inferences that may be drawn therefrom must be examined in the light most favorable to the party opposing summary judgment.  Spaulding v. United Transp. Union, 279 F.3d 901, 904 (10th Cir.), *cert. denied*, 537 U.S. 816 (2002).  Once the moving party meets its burden, the party opposing the motion must come forward with specific facts, supported by admissible evidence, which demonstrate the presence of a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49, 106 S. Ct. 2505, 2510 (1986); Biester v. Midwest Health Servs, Inc., 77 F.3d 1264, 1266 (10th Cir. 1996).  The party opposing the motion may not rest upon the mere denials of his pleadings to avoid summary judgment.  Fed. R. Civ. P. 56(e);  Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991).  Rather, the

nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." Mitchell v. City of Moore, Okla., 218 F.3d 1190, 1197-98 (10th Cir. 2000) (internal citation omitted).

**Analysis**

## I.    QUIET TITLE ACT ("QTA")

The QTA is the "exclusive means by which adverse claimants [may] challenge the United States' title to real property." Rio Grande Silvery Minnow v. Bureau of Reclamation, 599 F.3d 1165, 1175 (10th Cir. 2010) (internal citations omitted).  Historically, a party could not bring a quiet title action against the United States unless the United States waived its sovereign immunity. Amoco Production Co. v. United States, 852 F.2d 1574, 1577 (1988) (internal citations omitted). "In 1972, Congress created an exception to the United States' sovereign immunity in quiet title actions through the QTA of 1972 . . . ." Id. (internal citations omitted).  However, the waiver of immunity is not unconditional; rather, it is a limited waiver subject to a twelve-year statute of limitations.  28 U.S.C. § 2409a(g).

## II.    STATUTE OF LIMITATIONS

"The QTA statute of limitations acts as a jurisdictional bar . . . .  It is not merely an affirmative defense." Rio Grande Silvery Minnow, 599 F.3d at 1175-76.  Compliance with the twelve-year limitations provision is a jurisdictional prerequisite to quiet title suits against the United States. Block v. North Dakota, 461 U.S. 273, 282 (1983).  Thus, a party seeking to quiet title against the United States must bring an action within twelve years of the accrual date.  28 U.S.C. § 2409a(g).  The QTA's limitations period is strictly construed in favor of the government. Rosette Inc. v. United States, 141 F.3d 1394, 1397 (10th Cir. 1998) (citation omitted); see also Southwest Four Wheel Drive Ass'n v. Bureau of Land Mgmt., 271 F. Supp. 2d 1308, 1311 (D.N.M. 2003)

6

("Because it provides a statutory waiver of sovereign immunity, the courts strictly and narrowly construe the QTA and its statute of limitations"), *aff'd*, 363 F.3d 1069 (10th Cir. 2004). If a plaintiff's lawsuit is time-barred by the QTA's limitation period, the suit is extinguished procedurally, and the district court is precluded from reaching the substantive merits of the plaintiff's lawsuit.[3]  Amoco Production, 852 F. 2d at 1578 (citation omitted).

In determining the accrual date, the QTA's statute of limitations provides that "[s]uch action shall be deemed to have accrued on the date the plaintiff or [her] predecessor in interest knew or should have known of the claim of the United States." 28 U.S.C. § 2409a(g). In other words, a claimant's or predecessor in interest's knowledge may be actual or constructive in nature. *See* Amoco Production, 852 F.2d at 1577-78 (discussing whether there was sufficient evidence that plaintiffs had "actual knowledge" of United States' claims after determining an issue of constructive knowledge). "All that is necessary for a claim to accrue under this statute is a reasonable awareness that the government claims some interest adverse to the plaintiff[]." Southwest Four Wheel Drive Ass'n, 271 F. Supp. 2d at 1311 (citation omitted). Purchasers of real estate not only are deemed to have actual knowledge of matters that appear of record but also "by what they could have learned by inquiry of the person in possession and of others who, they had reason to believe, knew of facts which might affect the title." Machover v. Abdallah, 329 F.2d 800, 802 (3d Cir. 1964) (citation omitted).

Indeed, The government need not "provide explicit notice of its claim. . . .  Knowledge of the claim's full contours is not required. All that is necessary is a reasonable awareness that the

---

[3]As explained in Amoco Production, a procedural time bar does not affect the substantive rights and claims of the parties to the lawsuit. The claimant with title to a disputed tract of land retains title even if the lawsuit to quiet title is time-barred. The title dispute essentially remains unresolved. Amoco Production, 852 F.2d at 1578-79.

Government claims *some* interest adverse to the plaintiff's." <u>Rio Grande Silvery Minnow</u>, 599 F.3d

at 1176.

> Thus, the starting of the limitations clock is not dependent on the
> plaintiff knowing the precise nature of the property interest upon
> which the United States predicates its claim of title. *See Spirit Lake
> Tribe [v. North Dakota]*, 262 F.3d [732,] 738 [8ᵗʰ Cir. 2001] ("The
> government's claim need not be clear and unambiguous." (internal
> quotation marks omitted)); *see* <u>Richmond, Fredericksburg & Potomac
> R.R. Co. v. United States</u>, 945 F.2d 765, 770 (4ᵗʰ Cir. 1991)
> ("Assuming *arguendo* that RF&P did not know the exact nature of
> the government' claim in 1938, it still could not escape the
> limitations bar, for all that is necessary for accrual is 'a reasonable
> awareness that the Government claims *some interest* adverse to the
> Plaintiff's'") (internal quotation omitted) (emphasis added).

<u>Id.</u> (some citations omitted).  "Simply put, the limitations period is triggered when a landowner has

reason to know that the government claims some type of adverse interest in that land." <u>Id.</u>, 599 F.3d

at 1177 (internal citation omitted).

Moreover, a predecessor's knowledge that the government claims an interest adverse to the

land owner may be imputed to the successor purchaser.  *See* <u>Porter v. Samuel</u>, 889 F. Supp. 213, 220

(D.V.I. 1995) (predecessor in interest's knowledge was imputed to her successors in interest, and

therefore, claim brought under the QTA was time-barred).  Although the QTA is interpreted

according to federal law, federal courts may look to state law to assist with the determination of the

application of statutory language to specific facts. <u>Rio Grande Silvery Minnow</u>, 599 F.3d at 1177

(citations omitted).  In particular, questions about real estate are traditionally resolved according to

the law of the state where the realty is located.  <u>Id.</u>  (citation omitted.)  Nonetheless, state law should

be interpreted so that it can best effectuate the pertinent federal policy.  <u>Id.</u>

In <u>Camino Real Enters, Inc. v. Ortega</u>, the New Mexico Supreme Court held that the

purchasers of real property had constructive notice of an improvement agreement, where the

agreement, while not originally recorded, was attached to the contract of sale between the original

subdivider and new subdivider, and was recorded before the purchaser's purchase of the subject lot. Camino Real Enters., 107 N.M. 387, 388 (1988). The Supreme Court reasoned that "New Mexico is a notice recording jurisdiction," where recorded documents gave "notice to all the world of the existence and contents of the instruments so recorded from the time of the recording." Id. (*citing* NMSA §§ 14-9-1, 14-9-2). *See also* Hindi v. Smith, 73 N.M. 335, 338-39 (1963) (in New Mexico, knowledge of a current owner that prior owner was prohibited from erecting a gate on public road was sufficient to bind current owner under an injunction issued against the prior owner); Kootenai Canyon Ranch v. United States Forest Serv., 338 F. Supp. 2d 1129, 1134 (D. Mont. 2004) (QTA statute of limitations barred action because the plaintiff or its predecessors had notice concerning scope of use of the easement in question for past 30 years).

Here, similar to Kootenai Canyon Ranch, the parties do not dispute the government's interest in FDR 6819, but rather the scope of the interest claimed. [Doc. 47, p. 9.] *See id.*, 338 F. Supp. 2d at 1133 (question of title to easement not in dispute; instead, the only issue for purposes of statutes of limitation question was the scope of the government's title in the easement). The Court "must determine whether or when [George] or [her] predecessors in interest knew or should have known of the United States' belief" that no gates were permitted on FDR 6819. "The test is one of reasonableness." Id. In other words, do the undisputed material facts demonstrate that the Carricos (predecessors in interest) or George, acting as reasonable landowners, knew or should they have known that Defendants claimed "some interest" adverse to the claimant's, for more than twelve years before George filed her lawsuit in September 2009?

For the reasons set out below, the Court answers this question in the affirmative. George or her predecessors in interest had reason to know that Defendants claimed some interest adverse to

George's interest in placing closed gates across FDR 6819, from as early as 1979 or as late as May 1997.  Under either date, the lawsuit is barred by the twelve-year statute of limitations.[4]

### A. *Defendants' Authority to Maintain Easement*

Well before the 1979 conveyance of land at issue and George's purchase of Lot 1 in 2005 (*see discussions infra*), there is no question that Congress had delegated to the Secretary of Agriculture the authority to regulate the use of public lands.[5]  Moreover, it is undisputed that Shrine Mine Road is located on public lands within the Gila National Forest.

The United States Forest Service manages a road system under the rules and regulations set out in the Code of Federal Regulations, specifically, 36 C.F.R. Part 212.  Those regulations prohibit "[b]locking, restricting, or otherwise interfering with the use of a road, trail, or gate" on the Forest Service right-of-way without permission.  36 C.F.R. § 261.12(d).  Title 36 C.F.R. § 261.10(a) also prohibits "[c]onstructing, placing, or maintaining any kind . . . of structure, fence, enclosure . . . or other improvement on National Forest System lands or facilities without a special-use authorization. . . ."  George's erection of a gate across FDR 6819, without obtaining a special use permit, violated the above-stated regulations.

Neither the 1979 conveyance to Hamilton nor the subsequent sales of Lot 1 altered or diminished the Secretary of Agriculture's longstanding authority to regulate and prohibit activities on the recorded easement of FDR 6819, that was located within national forest lands.  Moreover,

---

[4]If the accrual date is deemed to be 1979, the complaint had to have been filed by about 1991. Thus, under that scenario, George's lawsuit was filed 18 years too late.  If the date runs from May 1997, the lawsuit had to have been filed by May 2009, about four months before the lawsuit was filed in September 2009.

[5]The United States' authority to regulate the use of public lands derives from the United States Constitution, Article IV, Section 3, Clause 2.

it cannot be said that because George might have been unaware of Defendants' regulatory authority to prohibit the erection of gates on its easement, she is without notice or constructive knowledge of the applicable regulations.  *See, e.g.,* <u>Southwest Four Wheel Drive Ass'n</u>, 271 F. Supp. 2d at 1312 ("Publication in the <u>Federal Register</u> is legally sufficient notice to all interested or affected persons regardless of actual knowledge or hardship resulting from ignorance.") (citation omitted); <u>Miller v. American Banker's Ins. Group</u>, 85 F.Supp.2d 1297, 1301 (S.D. Fla. 1999) (Plaintiff charged with knowledge of policy contents given that the one year statute of limitations was published in the United States Code and in the Code of Federal Regulations).

    **B.**    <u>***1979 Conveyance of Land to Hamilton and 1981 Plat***</u>

It is undisputed that in 1979, the United States conveyed land adjacent to the Gila National Forest to Hamilton and that the United States reserved two easements in that land.  Only one easement is at issue in this case, *i.e.,* the Secretary specifically reserved a right-of-way over the Shrine Mine Road, otherwise known as FDR 6819.  (*See supra* at p. 2 for exact description.)  When the easement was reserved, the Shrine Mine Road was unencumbered by any gates crossing it.  The government's reservation of a right-of-way easement in FDR 6819 was specific, part of the documents evidencing the 1979 land exchange, and filed of record.  Thus, under New Mexico law, the recorded easement was notice to "all of the world," including the Carricos who purchased some of the land at issue in 1990 and George who purchased Lot 1 from the Carricos in 2005.

For many years before the government reserved this easement in 1979, the public and Forest Service used Shrine Mine Road for ingress and egress to National Forest system lands.  During those many years, the road was unencumbered by any gates crossing it.  There is no evidence in the record showing that Defendants ever allowed the erection of open or closed gates across FDR 6819, or more specifically, that portion of FDR 6819 that runs through George's property.  Indeed, the only

11

evidence concerning gates on FDR 6819 relates to George's violative use of gates after she purchased Lot 1.  She was cited on multiple occasions by the Forest Service for violating regulations that prohibited the use of closed gates across the easement.  Thus, George failed to raise a genuine issue of material fact that closed gates had ever been permitted to cross FDR 6819.  Moreover, her argument that gates are used across other roads in the forest road system has no bearing on what was permitted on this particular easement.

In about July 1981, the property conveyed to Hamilton was platted and subdivided into what became known as the Oak Grove North Subdivision. Aerial photographs in 1980 and 1991 show the Shrine Mine Road running across a number of the lots in the Oak Grove North Subdivision. [Doc. 44, Attachment 1 ("History").]

### C.      *Carrico's Acquisition of Lot 1 in 1990*

Before 1997, much of the land within the Oak Grove North Subdivision was held in receivership by Western Bank as a result of foreclosure proceeding.  As a result of those proceedings, on March 13, 1989, Western Bank acquired Lot 1 of the Oak Grove North Subdivision. On March 13, 1989, a Special Master's Deed was recorded with respect to this transaction. [Doc. 44, Attachment 6.]

On August 27 1990, an Escrow Sales Agreement was executed between Western Bank (sellers) and Edwin and Dianne Carrico (buyers.)  The Sales Agreement was recorded in Grant County, New Mexico, describes the Oak Grove North Subdivision, and further states it is "[s]ubject to reservations, restrictions, and easements of record." [Doc. 44, Attachment 7.] The sales agreement was signed by Mr. and Mrs. Carrico. While the sales agreement did not specifically mention the government's easement in FDR 6819, that easement was of record since 1979.

In 2005, Western Bank executed a deed to Mr. and Mrs. Carrico in accordance with the Escrow Sales Agreement.  That Special Warranty Deed described Lot 1 and again stated "Subject to reservations, restrictions, and easements of record." [Doc. 44, Attachment 8.] The government's easement in FDR 6819 was of record.  Subsequently, Mrs. Carrico deeded her interest in Lot 1 to Mr. Carrico. [Doc. 44, Attachment 8 ("Special Warranty Deed").]

> **D.**     ***George's 2005 Purchase of Lot 1 from Mr. Carrico***

On March 15, 2005, Mr. Carrico sold Lot 1 to George.  The Warranty Deed, that was recorded in Grant County, described Lot 1, noted which Book of Plats it was recorded in, and stated: "Subject to reservations, restrictions and easements of record." [Doc. 43, Ex. 4, Doc. 44, Attachment 8.] The government's easement in FDR 6819 was of record.

All of the real estate purchase-related documents, *i.e.,* the MLS Listing and Property Disclosure Statement for the 2005 sale of Lot 1 referred to and described the then existing Shrine Mine Road.  The title policy commitment letter and title policy bought by George as part of her purchase of Lot 1 refers to the reservation for Shrine Mine Road and the fact that the "easement to 208" was "recorded in book 673-74 at Pages of Miscellaneous Records of Grant County, New Mexico.  [Doc. 43, Exhibits 5 and 6.]

Moreover, the Oak Grove North Subdivision Plat [Doc. 43, Ex. 6] given to George prior to closing, clearly shows 20 lots within the subdivision and Lot 1, the subject lot.  The subdivision plat also depicts Shrine Mine Road traversing various lots, including Lot 1.

George personally visited Lot 1 before she purchased it and observed the existence of Shrine Mine Road on the property without gates.  She walked and inspected the property.  Indeed, it was common knowledge among the community that Shrine Mine Road was not abandoned and that gates

could not be erected on it.[6]  Linda Middlebrook, who had previously lived in the subdivision and

who also acted as George's real estate agent, testified that when she lived there she did not recall

anyone erecting a gate that crossed FDR 6819.  [Doc. 47, p. 17; Doc. 47, Ex. 6, Middlebrook Dep.,

at 15-17.]   FDR 6819 had yellow markers along it stating "Forest Road" or "Property of the US

Forest," or something like that. [Doc. 47, Ex. 6, Middlebrook Dep. at pp. 23-24.]

### E.       *1996 Inquiries by Lot Owners, Public Meetings, and May 1997 Letter*

In 1996, lot owners in the Oak Grove North Subdivision began inquiring about management

of FDR 6819.  The discussions included the possibility of the Secretary abandoning the easement

all together and using other roads to access forest lands.  Other discussions focused on whether lot

owners could place gates across the road.  District Ranger Gerald Engel held two public meetings,

during which these matters were discussed.

Ultimately, the Secretary rejected the scenario that would allow residents to maintain closed

gates on FDR 6819, along private property boundaries, because it would require travelers of the road

to exit their vehicles 16 or more times to open and close gates on approximately 4,050 feet of road

(assuming all residents installed such gates).  In addition, the Forest Service determined it would be

hazardous to allow gates over FDR 6819, as there was no history of such gates over that road, and

travelers would not expect to encounter obstructions while traveling FDR 6819.  The Forest Service

---

[6]George attempts to challenge this fact.  However, Linda Middlebrook, on whose testimony
Defendant relies, stated she and George talked about the road, "so it was common knowledge."  Further,
Middlebrook testified she knew the road was not abandoned.  Even though the Forest Service had not
maintained the road while Middlebrook was there, "we knew it wasn't abandoned.  That was common
knowledge, especially after all the dealing with the Forest Service and the meetings and everything.  We
knew that it wasn't abandoned, but that's what we were trying to do, was to get them to do it."   [Doc. 43,
Ex. 3, pp. 11, 19.] The Court finds the fact undisputed.

also found that gates would impede maintenance of the road, in part because gates and gate posts could obstruct equipment access for heavy equipment and road graders.

After meeting with landowners and considering various suggestions for managing FDR 6819, on May 19, 1997, District Ranger Gerald Engel, wrote a letter to all known residents of Oak Grove North Subdivision. He had explored the possibility of using alternative access to forest lands but learned that such access was not possible due to higher costs, the need to pass through private land where the government did not have easements, covenant restrictions, and other concerns. [Doc. 44, Ex. 2, Attachment 3, Apr. 30, 1997 letter; Attachment 5, May 19, 1997 letter]. The District Ranger further stated in the May 19, 1997 letter:

> After public involvement and deliberation, my decision is to retain the Shrine Mine Road in its current location. Any structures, such as fences or gates placed within the 66 foot easement must meet Forest Service specifications. These specifications include a 12 foot wide cattleguard, and a 16 foot wide livestock/heavy equipment gate. This decision is not appealable.

[Doc. 44, Ex. 2, Attachment 5.] The 16 foot wide equipment gate could be placed to the side of the road but no gates, locked or unlocked, were allowed to cross FDR 6819.[7] [Doc. 42, Ward Dep., pp. 80-81.]

George argues that the May 1997 letter could only have triggered the accrual date for statute of limitations purposes if there are undisputed facts demonstrating that George or the Carricos knew or should have known of the United States' adverse claim at that time. Contrary to the government's position that it sent the May 1997 letter to all known residents of the Oak Grove North Subdivision,

---

[7]While George argues with some of this information, she fails to rebut the substance of the material fact.

including the Carricos, George asserts the existence of a material dispute as to whether the Carricos were mailed or received the May 1997 letter.

In support of its Motion for Summary Judgment, the government attached a mailing list with the May 1997 letter, indicating the Carricos and others were on the mailing list to receive the letter. George file a motion to strike this exhibit because the government had earlier produced other versions of the mailing list that redacted every name on the list.  Thus, before filing the motion for summary judgment, the government had not produced any evidence demonstrating the Carricos were on the 1997 mailing list.  George contends the government should not be permitted to rely on this "surprise" exhibit that was not disclosed in accordance with Fed. R. Civ. P. 26 and that the government should be sanctioned as well.

The Court elects not to rely on this exhibit in reaching its ruling in this matter.  Therefore, based on its ultimate conclusion granting Defendants' motion for summary judgment, George's motion to strike [Doc. 46] is denied as moot.

## III.    <u>CONCLUSION</u>

The Court determines that George or Carricos, the predecessors-in-interest, had constructive knowledge, as early as 1979, of Defendant's right to maintain an ungated FDR 6819 easement through Lot 1.  Therefore, under the QTA's twelve-year statute of limitations, George's lawsuit filed in September 2009 is untimely and must be dismissed, with prejudice.

The Court reaches this determination after considering the recordation of the 1979 patent that described the government's reservation of the easement in FDR 6819, the government's long-standing authority to prohibit the erection of gates or fences across roads in public lands in accordance with published regulations, the common knowledge that FDR 6819 had been ungated for years, knowledge of the Carricos, George, or other Oak Grove North Subdivision landowners

16

that an ungated FDR 6819 passed through their property for years, an absence of any evidence showing gates were ever used across FDR 6819 before George attempted to use gates, aerial photographs from early 1980 and 1990 showing FDR 6819 running through the subdivision, and recorded deeds from the 1990's acquisition of Lot 1 by the Carricos that note the conveyance is subject to existing easements.

In addition, the Court observes the pertinent legal principles that apply in this case, particularly: (1) the QTA statute of limitations is strictly and narrowly construed in favor of the government; (2) recordation of the easement (as early as 1979) is notice to "all of the world" under New Mexico law, which should be construed in favor of federal policy, which in this case, means construed consistent with a strict interpretation of the limitations period in favor of the government; (3) knowledge of the predecessor-in-interest is imputed to the successor, George; (4) knowledge of the "full contours" or the "precise nature" of the government's scope of easement is not required; (5) all that is necessary for purposes of accrual is "a reasonable awareness that the Government claims *some interest* adverse to the plaintiff," and (6) reasonable landowners, such as the Carricos or George would have known that the government had some interest adverse to the claimant based on many years of use of FDR 6819 without locked or unlocked gates crossing it.

George contends that the recordation of the 1979 patent alone is not sufficient to show when the United States first asserted authority to prohibit installation of unlocked gates on the easement. George further explains that the 1979 easement makes no reference to the United States' authority to prohibit unlocked gates on the servient estate and does not mention gates at all. The Court set forth a thorough analysis as to why there is sufficient evidence demonstrating an accrual date of 1979. In addition, the pertinent Code of Federal Regulations were in effect prior to 1979 and

provided the Forest Service with authority to maintain the road at issue and specifically prohibited gates under these circumstances.

The Court also finds unpersuasive George's reliance on the Ninth Circuit's decision in McFarland v. Norton, 425 F.3d 724 (9th Cir. 2005).  In that case, the landowner claimed an easement over a federally-owned road to his property within Glacier National Park and challenged whether the National Park Service arbitrarily and capriciously denied his request for a special use permit to use the road during the winter time.  Id. at 725.  Essentially, McFarland was unable to access his property at all during certain months because of the Park Service's refusal to unlock gates.  The facts in that case are distinguishable from those here.

In sum, because George's lawsuit is untimely and the QTA statute of limitations divests this Court of jurisdiction, the Court grants Defendant's motion for summary judgment and dismisses George's complaint, with prejudice.

Defendant agreed to dismiss its counterclaims against George if the Court granted Defendant's motion for summary judgment.  This being the case, Defendant is directed to file a pleading within ten (10) days of this Order dismissing all counterclaims against George.  Once that occurs, Judgement in favor of Defendants will be entered.  Based on Defendant's representations that the counterclaims will be dismissed, Plaintiff's Motion for Partial Summary Judgment (that addresses the counterclaims) will be denied as moot.

IT IS THEREFORE ORDERED that: (1) Defendant's Motion for Summary Judgment [Doc. 43 is granted, with the result that the scope of the FDR 6819 easement to ungated access across George's property may not be challenged due to statute of limitations grounds and Plaintiff's Complaint is dismissed, with prejudice; (2) Defendants must file dismissal pleadings of all counterclaims within ten (10) days after entry of this Order; (3) Plaintiff's Motion to Strike [Doc.

18

46] is denied as moot; and (4) Plaintiff's Motion for Partial Summary Judgment [42] is denied as moot.

_Lorenzo F. Garcia_
Lorenzo F. Garcia
United States Magistrate Judge